

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | WD85909 |
| | ) | |
| v. | ) | OPINION FILED: |
| | ) | |
| DMARIUS M. BOZEMAN, | ) | August 27, 2024 |
| | ) | |
| Appellant. | ) | |
| | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**Honorable Jalilah Otto, Judge**

**Before Division Two: W. Douglas Thomson, Presiding Judge,**
**Karen King Mitchell, Judge, and Janet Sutton, Judge**

Dmarius Bozeman (Bozeman) appeals the judgment of the Jackson County Circuit Court (trial court) finding him guilty, after a jury trial, of one count of second-degree murder, four counts of armed criminal action, and three counts of first-degree endangering the welfare of a child. Bozeman raises three points on appeal: (1) that the State failed to present sufficient evidence that Bozeman did not act under sudden passion arising out of adequate cause, as required to sustain his conviction of second-degree murder; (2) that the trial court abused its discretion in preventing Bozeman from cross-examining a detective about a witness's prior inconsistent statement; and (3) that the trial court plainly erred in seating a juror with a felony conviction. We affirm.

## Factual and Procedural Background[1]

Bozeman and his girlfriend, Victim, lived in a house together. Also living at the house were Victim's nineteen-year-old son R.H., sixteen-year-old adopted son K.S., fifteen-year old adopted son J.S., and thirteen-year-old son K.T. D.S., a nineteen-year-old boy who J.S. and K.S. previously knew from foster care, also lived at the house.

In the early afternoon on February 17, 2021, Victim and Bozeman started to argue downstairs at the house. R.H., K.S., J.S., K.T., and D.S. (the boys) all went downstairs when they heard the arguing. Bozeman was on top of Victim, pinning her to the floor. Victim was telling Bozeman to get off of her. Bozeman told the boys to go upstairs because they were not supposed to be downstairs. R.H. told Bozeman to let go of Victim, and the boys "pretty much pulled [Bozeman] off of [Victim]." Bozeman appeared angry and said he would fight the boys and threatened to kill them. R.H. then punched Bozeman and the boys and Victim started fighting Bozeman.

J.S. went upstairs to R.H. and K.S.'s room to get a gun because J.S. knew that Bozeman had a gun in the house. J.S. went back downstairs with the gun behind his back, and the fighting was still going on. His intent was to give it to R.H. in case he needed it. J.S. did not display the gun and he was unable to give it to R.H.

The fighting stopped after Bozeman asked if he could get his stuff and leave. K.S. went upstairs to get Bozeman an outfit, shoes, and backpack. K.S. put the backpack in the downstairs

---

[1] In addressing a challenge to the sufficiency of the evidence to support a criminal conviction, "[t]he evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict." *State v. Minor*, 648 S.W.3d 721, 736 (Mo. banc 2022) (citation omitted).

hallway and threw Bozeman his clothes. Bozeman saw that K.S. brought his belongings downstairs. K.S., however, did not believe Bozeman saw that K.S. had a gun in his hand.

R.H., K.H., and D.S. went upstairs to their bedrooms, and Bozeman and Victim also went upstairs. Bozeman retrieved his firearm from his room. No one tried to rush into Bozeman's room. K.S. was in his bedroom doorway when he saw Victim walking towards her bedroom door. Two shots went off and K.S. saw Victim drop to the hallway floor.

J.S. and K.T. were on the stairs when the shots were fired upstairs. They ran out the back door.

After hearing the shots, K.S. went into his room and onto his bed. Shortly after, Bozeman came into K.S.'s room and pointed a gun at both K.S. and R.H.'s faces. Bozeman asked R.H. if R.H. wanted to be "grown." R.H. then shoved a dresser mirror into Bozeman to form a barricade and force Bozeman out of the room. K.S. and R.H. then went out of their room and carried Victim's body downstairs to the base of the stairs before they went outside.

J.S. gave R.H.'s gun to K.T. R.H. took the gun from K.T. and ran back into the house. Multiple shots were fired in the house. K.S. followed R.H. into the house but stopped when he heard gunfire. Bozeman killed R.H. after a shoot-out.

Victim died as a result of multiple gunshot wounds. Victim suffered a gunshot wound to the right upper arm that was a through-and-through injury, a grazed gunshot wound to the central abdomen, and three shots to the left breast that exited her back. Bozeman had multiple gunshot wounds to his legs.

Kansas City, Missouri Police Department officers were dispatched to the house. Bozeman had barricaded himself in his bedroom and, at some point, disassembled his gun.

3

Bozeman eventually came out of the house and was taken into custody. Bozeman told an officer that two people were shot in the house and that he too had been shot.

Police found a Glock 22 .40 caliber firearm outside the house's back door and another disassembled Glock 22 .40 caliber firearm in the upstairs master bedroom. Bullet holes were found in the wall at the top of the stairwell.

Bozeman was transported to the hospital. On the way, Bozeman told an officer that he fired his gun when "they were rushing him." Bozeman said he was lying on the bed and that he shot Victim in the chest. He also stated that he shot R.H. Bozeman then told a hospital chaplain that he had fired one warning shot at the floor. Later, he told a nurse that he fired two warning shots.

The State charged Bozeman with two counts of second-degree murder for causing Victim and R.H.'s deaths by shooting Victim and R.H., three counts of first-degree endangering the welfare of a child for knowingly acting in a manner that created a substantial risk to the life, body, and health of K.T., J.S., and K.S., children less than seventeen years old, by shooting a firearm in the residence where they were present, and five counts of armed criminal action.

Bozeman testified at trial. Bozeman testified he argued with Victim that day and the fight became physical after Victim shoved him and then Bozeman knocked food from Victim's hand. Bozeman claimed that Victim hit and scratched him, and that he swung his fist at Victim after she kicked him. Bozeman eventually ended up holding Victim down on the ground.

Bozeman testified that at that point the boys came downstairs. Bozeman claimed that the boys looked like they were "going to whoop [his] ass." Bozeman said that he began to leave the area, but he was surrounded by the boys. Bozeman said that K.T. accused him of hitting Victim,

4

and when Bozeman denied it, Bozeman was hit on the head. Bozeman claimed that he lost consciousness and that when he awoke the boys were punching and kicking him.

Bozeman testified that after he came to, the boys stopped attacking him, and R.H. told the other boys to go and get Bozeman's things. Bozeman testified that R.H. gave him permission to get his things and leave. Bozeman turned to Victim to tell her that they were "done" and that there were "no hard feelings, no nothing."

Bozeman testified that he then went upstairs to his bedroom, took off his ripped tank top, grabbed a t-shirt, went to his dresser, grabbed a new tank top, and began looking for his phone to call the police. Bozeman said that he could not find his phone and keys, so he then looked for his gun, found it, and put the gun on the bed.

Bozeman testified that he began putting on his tank top and then he heard "a bunch of people running up the stairs" and he thought they were going to "beat the shit out of [him] again." Bozeman heard his bedroom door open, he yelled to be left alone, and then he fired two warning shots "downwards." Bozeman said whoever was coming in his room left. On cross-examination, Bozeman testified that he "never said [he] shot right at the ground," but then he later testified that he "shot at the ground." At one point, Bozeman testified "so when they came in, I said, leave me the f*** alone. I stretched my arm out—boom, boom."

Bozeman went to his bedroom door, opened it and looked into R.H.'s room, and he saw R.H. lift his mattress. Bozeman thought R.H. had a gun. Bozeman walked to the doorway of R.H.'s room with his gun in his hand and Bozeman was hit with a mirror. Bozeman waved his gun around at that point.

Bozeman testified that he then turned and saw Victim lying on the floor and that he thought Victim was "playing." Bozeman saw a "hole" in Victim's chest and two bullet holes in

5

the wall. Bozeman returned to his bedroom and began looking for his keys and phone. When Bozeman left his bedroom, he saw that Victim was not in the hallway, but instead near the bottom of the stairs.

Bozeman testified that R.H. ran into the house, saw Bozeman and Victim, and then R.H. screamed and ran outside. Bozeman stated that R.H. came back in the house and started shooting at him. Bozeman testified that he was on the floor holding Victim and that he shot back at R.H. Bozeman heard R.H. gasp, saw R.H. drop his gun, and fall. Bozeman ran upstairs, found a phone, and called 911.

On Count I, the second-degree murder count related to Victim, the jury was instructed on second-degree murder, and the lesser included charges of voluntary manslaughter, first-degree involuntary manslaughter, and second-degree involuntary manslaughter. The trial court gave self-defense instructions on both second-degree murder counts.

The jury found Bozeman guilty of one count of second-degree murder for the murder of Victim, three counts of first-degree endangering the welfare of a child, and four counts of armed criminal action. The jury found Bozeman not guilty of the murder of R.H. and the accompanying armed criminal action count.

The trial court sentenced Bozeman to twenty-five years' imprisonment on the second-degree murder count, five years' imprisonment on each of the first-degree endangering the welfare of a child counts, and five years' imprisonment on each of the four armed criminal action counts. The trial court ordered the second-degree murder and endangering counts to run concurrently with each other and ordered the armed criminal action counts to run consecutively to the other counts.

Bozeman appeals.

6

**Discussion**

**Point One: Sufficiency of the Evidence**

In his first point, Bozeman alleges the trial court erred in overruling his motion for judgment of acquittal at the close of all of the evidence because he contends the evidence was insufficient to support his convictions for second-degree murder and armed criminal action. Bozeman claims the State failed to prove beyond a reasonable doubt that he did not act under the influence of sudden passion arising from adequate cause.

To determine whether the evidence was sufficient to support a conviction and to withstand a motion for judgment of acquittal, this Court does not weigh the evidence but, instead, we accept as true the evidence tending to prove guilt together with all reasonable inferences that support the verdict, and we ignore all contrary evidence and inferences. *State v. Naylor*, 510 S.W.3d 855, 858-59 (Mo. banc 2017). "This Court's review is limited to determining whether there was sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *Id.* (quoting *State v. Letica*, 356 S.W.3d 157, 166 (Mo. banc 2011)). This is not an assessment of whether we believe that the evidence at trial established guilt beyond a reasonable doubt but instead, we question whether, "in light of the evidence most favorable to the State, any rational fact-finder 'could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011) (quoting *State v. Bateman*, 318 S.W.3d 681, 687 (Mo. banc 2010)).

A person commits second-degree murder if he or she knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes

7

the death of another person.  Section 565.021.1(1).[2]  "However, if the defendant's conduct meets the elements of conventional second-degree murder, but the act is committed under the influence of sudden passion arising from adequate cause, he would be guilty of voluntary manslaughter." *State v. Mack*, 624 S.W.3d 436, 454 (Mo. App. E.D. 2021) (citing § 565.023.1(1)).  *See also State v. Price*, 928 S.W.2d 429, 431 (Mo. App. W.D. 1996).  Acting under the influence of sudden passion arising from adequate cause is a special negative defense to conventional second-degree murder.  *Mack*, 624 S.W.3d at 454.

Sudden passion means "passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation[.]"  Section 565.002(15).  Adequate cause is defined as "cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control[.]"  Section 565.002(1).  Adequate cause requires a showing of "a sudden, unexpected encounter or provocation tending to excite the passion beyond control such that it renders a person of ordinary temperament incapable of reflection, or such passion as to obscure reason."  *Price*, 928 S.W.2d at 431.

Passion may be rage, anger, or terror, but it must be so extreme that for the moment, the action is directed by passion and not by reason.  *Id.*  Further, the offense must have been "committed in sudden passion and not after there has been time for the passion to cool."  *Mack*, 624 S.W.3d at 454-55 (citing *State v. Redmond*, 937 S.W.2d 205, 208 (Mo. banc 1996)).

---

[2]  Statutory references are to the Revised Statutes of Missouri 2016, and all rule references are to the Missouri Supreme Court Rules.

In this case, there was sufficient evidence from which the jury could have reasonably found that Bozeman did not shoot Victim while under the influence of sudden passion arising out of adequate cause. Bozeman left the boys and Victim after the fight downstairs, took the time to tell Victim that they were "done" and then he went upstairs to his room. While in his room, Bozeman had time to select a new t-shirt, new tank top, and put the new tank top on. Bozeman also took time to look for his phone and car keys and to retrieve his gun and put it on the bed so he could easily reach it. Thus, Bozeman's act of leaving the area of the fist fight, going to his bedroom, and the subsequent actions he took there were a break in the chain of events which would have allowed a reasonable person to reflect on his actions. *See Price*, 928 S.W.2d at 431-32 (concluding that "there were breaks in the chain of events which would have allowed a reasonable person to reflect on his actions" and that the defendant did not act under sudden passion when he shot the victim).

Further, Bozeman's self-serving testimony also supports that he did not act under sudden passion arising from adequate cause. Bozeman claimed that he fired two warning shots after the door to his bedroom opened and that he did so consciously. Bozeman appears, therefore, to have had the presence of mind to fire warning shots that he claims did not intend to hit anyone. "Passion, whether rage, anger, or terror, must be so extreme that for the moment, the conduct is driven by passion, not reason." *State v. Simpson*, 315 S.W.3d 779, 783 (Mo. App. W.D. 2010) (citing *Price*, 928 S.W.3d at 431). Bozeman's actions in his bedroom establish sufficient evidence from which a jury could find that his conduct was not driven by passion.

The trial court did not err in overruling Bozeman's motion for judgment of acquittal at the close of all of the evidence. There was sufficient evidence of second-degree murder presented from which a reasonable juror could find Bozeman was not acting under the influence

9

of sudden passion arising from adequate cause, and, accordingly, that there was sufficient evidence of the accompanying armed criminal action count.

Point one is denied.

**Point Two: Attempted Impeachment with Prior Inconsistent Statement**

In his second point, Bozeman argues the trial court abused its discretion when it sustained the State's objection and he was precluded from cross-examining Detective N.A. regarding a prior inconsistent statement K.S. made during K.S.'s Child Advocacy Center (CAC) interview.

At trial during K.S.'s cross-examination, defense counsel asked K.S. if he knew "if [R.H.] started shooting" at Bozeman first. K.S. responded that he did not know if R.H. started shooting at Bozeman first. Defense counsel did not ask K.S. about any of his CAC interview statements.

Detective D.P. testified that he interviewed K.S. after the shootings. Detective D.P. did not testify about what K.S. said during the interview, although he did confirm that the boys' statements were "fairly consistent" with each other. Detective N.A. later testified that she attended K.S.'s CAC interview. Officer N.A. stated that K.S.'s statement was "consistent with what he had told [Detective D.P.] occurred." During Detective N.A.'s cross-examination, defense counsel asked Detective N.A. to review her report as to what K.S. said during his CAC interview. The State moved for a peremptory objection:

> [The State]: Judge, if she asks about any statements that he made, it's going to be [a] hearsay objection. I believe she's intending to do that.

> [Defense Counsel]: I am. But Judge, my argument to that would be she observed it. She was there when he gave the interview. They've opened the door asking about the interview that she observed. And I believe that I should be able to get into it.

> The Court: Are you—is it —I mean, what's the statements outline? Is it impeachment purposes? Prior consistent statements or prior inconsistent statements?

10

[Defense Counsel]: Judge, I would say they are prior inconsistent statements. Based on the fact that [K.S]—there's some statements in the report where [K.S] states that [R.H.] started shooting at [Bozeman], and [Bozeman] returned fire. Which is inconsistent with what he testified to. And I asked him if he remembered giving the interview, and he said he did not remember.[3] And I also gave him the information to refresh his recollection, and he said that he did not remember. And then also, Judge, in there, there's some other statements that he makes about [Victim] going into the bedroom. And about—I can't remember the other thing I have underlined on there. But there are some statements that are made that are inconsistent with what he testified to.

[The State]: It's all hearsay. If she wanted to impeach a witness with prior inconsistent statements, she needs to impeach that witness. This is improper to try and then backdoor some hearsay as an impeachment of a prior inconsistent statement. The proper witness to do that with would have been [K.S.] . . . .

The trial court sustained the State's objection.

"The trial court is vested with broad discretion in deciding the permissible scope of cross-examination that is reviewed on appeal for an abuse of discretion." *State v. Scott*, 548 S.W.3d 351, 365 (Mo. App. E.D. 2018) (citing *State v. Oates*, 12 S.W.3d 307, 313 (Mo. banc 2000)).

"To impeach a witness with extrinsic evidence of prior inconsistent statements, the witness must be given an opportunity to refresh his or her recollection and to admit, deny, or explain the statement." *State v. Boyd*, 871 S.W.2d 23, 26 (Mo. App. E.D. 1993); *Scott*, 548 S.W.3d at 365. "The sufficiency of the foundation for the admission of a prior inconsistent statement is within the discretion of the trial court." *Boyd*, 871 S.W.2d at 26.

To lay a proper foundation, "it is necessary to ask the witness whether he or she made the statement, quote the statement, and point out the precise circumstances under which it was allegedly made, including to whom the witness spoke and the time and place of the statement." *Id. See also Scott*, 548 S.W.3d at 365.

---

[3] We have reviewed K.S.'s trial testimony. Bozeman's counsel did not ask K.S. about his CAC interview. Bozeman's attorney did ask K.S. about a statement K.S. made to Detective D.P., but it was unrelated to whom K.S. said shot first.

11

Bozeman argues that the trial court erred in precluding him from cross-examining Detective N.A. about a prior inconsistent statement K.S. made in his CAC interview.[4] Bozeman alleges that K.S. said during his CAC interview that R.H. fired first at Bozeman then Bozeman returned fire. Bozeman argues the trial court should have allowed him to cross-examine Detective N.A. with this statement because the defense was entitled to demonstrate that K.S.'s CAC statement was inconsistent with K.S.'s trial testimony. Bozeman argues that by precluding him from doing so, his rights to cross-examination and a fair trial were violated. Bozeman also argues that even if it was improper impeachment, it was admissible because the State opened the door to the evidence. We disagree.

We rejected a similar claim in *State v. Boyd*, 871 S.W.2d 23 (Mo. App. E.D. 1993). In *Boyd*, a witness testified that he was walking on the street with two friends and someone was following them. *Boyd*, 871 S.W.3d at 25. The witness testified that when they "neared an alley, a car with two people pulled into the alley in front of them. The person behind them ran in front of them and demanded [the witness's] jacket. When [the witness] refused, the man pulled a gun and took the jacket" and then the man jumped in the car and it drove away. *Id.* On cross-examination, the witness testified that he spoke to a female police officer and "explained to her what happened." *Id.* at 26.

The defendant later called the officer to testify and she stated that she spoke with the witness on the day of the robbery. *Id.* The defendant asked the officer to read the police report of what else the witness told her and the State objected. *Id.* The report stated that "[the witness]

---

[4] Bozeman's entire argument under this point is in regard to an alleged prior inconsistent statement made by K.S. in his CAC interview. At trial, defense counsel made no offer of proof on K.S.'s purported prior inconsistent statement. On appeal, this Court has no proof of whether there was even a prior inconsistent statement in K.S.'s CAC interview.

told her he saw three black males leave a home, one man came running up to him and robbed him while the other two men got into an automobile." *Id.* The trial court sustained the objection and found that the defendant had failed to lay a proper foundation before moving to admit extrinsic evidence of the witness's prior inconsistent statements. *Id.*

On appeal, the Court held the foundation was inadequate, and therefore, there was no abuse of discretion in excluding the extrinsic evidence of the witness's alleged prior inconsistent statements. *Id.* The Court noted that while counsel generally discussed with the witness his conversation with the officer, "counsel did not quote the exact statements of [the witness]" or "ask [the witness] to admit, deny, or explain those statements." *Id.* The Court stated that allowing the impeachment of the witness through the officer would undermine "the rule of fairness underlying the foundation requirement[.]" *Id.*

Bozeman did not lay a proper foundation during K.S.'s testimony to impeach K.S. with the purported prior inconsistent statement. On appeal, Bozeman acknowledges that he did not ask K.S. if he told the CAC interviewer—or anyone else—that R.H. fired first. K.S. was not given the chance to have his recollection refreshed and to admit, deny or explain the purported prior inconsistent statement.

The rule providing for an adequate foundation "requires a witness be given a chance to present a complete picture of his or her credibility by explaining any inconsistency." *Boyd*, 871 S.W.2d at 26. Bozeman does not have the right to cross-examine "to whatever extent the defense wishes" and the "requirements of laying a foundation before impeaching a witness with prior inconsistent statements is a reasonable limit." *Id.* Bozeman had the opportunity to question K.S. about the purported prior inconsistent statement but chose not to do so. We are also skeptical how the exclusion of this evidence prejudiced Bozeman. Impeaching K.S. on this

statement would have gone to whether Bozeman acted in self-defense by shooting R.H. The jury, however, acquitted Bozeman of any charges relating to his shooting of R.H. Bozeman does not persuasively explain how impeaching K.S. with this particular statement would have made the jury question K.S.'s testimony about Victim's death – especially since Bozeman admitted that he fired the shots that killed Victim.

The trial court did not abuse its discretion in refusing to allow Bozeman to impeach K.S. with his purported inconsistent statement through Detective N.A.'s testimony.

Point two is denied.

### Point Three: Seating of Juror with Felony Conviction

In his third point, Bozeman argues that the trial court plainly erred in seating a jury that was not comprised of twelve qualified jurors because it violated section 494.425(4) by seating a juror with a felony conviction. Bozeman's claim of error on this issue was not included in his motion for new trial and he did not argue at any time in the trial court proceedings that Juror 18 was statutorily disqualified from serving on the jury pursuant to section 494.425(4). This claim, therefore, is unpreserved. Bozeman requests plain error review under Rule 30.20.

Rule 30.20 gives appellate courts discretion to review "plain errors affecting substantial rights . . . in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." "Plain error review is discretionary, and this Court will not review a claim for plain error unless the claimed error 'facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted.'" *See State v. Brandolese*, 601 S.W.3d 519, 526 (Mo. banc 2020) (quoting *State v. Clay*, 533 S.W.3d 710, 714 (Mo. banc 2017)).

> The plain language of Rule 30.20 demonstrates that not every allegation of plain error is entitled to review. The plain error rule is to be used sparingly and may

14

not be used to justify a review of every point that has not been otherwise preserved for appellate review. Unless manifest injustice or a miscarriage of justice is shown, an appellate court should decline to review for plain error under Rule 30.20.

*Id.* (internal quotation marks and citations omitted). "[T]he defendant bears the burden of demonstrating manifest injustice entitling him to plain error review." *Id.* (quoting *State v. Oates*, 540 S.W.3d 858, 863 (Mo. banc 2018)).

On Juror 18's juror questionnaire, when asked whether she had been convicted of a crime other than a traffic ticket, she indicated, "Yes." During voir dire, Juror 18 disclosed that she had previously been convicted of a felony:

> [The State]: Is there anyone here who has ever been found guilty of a felony? Found guilty of a felony crime or pleaded guilty to a felony? Yes, ma'am, No. 18.
>
> [Juror 18]: Weed. About 25 years ago.
>
> [The State]: That couldn't have been a felony, right?
>
> [Juror 18]: In Illinois, trust me. Yes, it's a felony. Yes indeed.
>
> [The State]: Oh my gosh. Okay. Anything about that that would cause you to not be a fair and impartial juror?
>
> [Juror 18]: No. It was medical, even back then.
>
> [The State]: I hope it was not a felony charge. We don't even prosecute. Our office doesn't prosecute.
>
> [Juror 18]: It was definitely a felony charge.
>
> [The State]: I think they're going to pass legalization anyway.
>
> [Juror 18]: Yeah. It was a long time ago, before I was a grandmother.

Later, the parties discussed whether Juror 18 was qualified to serve:

> The Court: The other one—let's talk about No. 18. She's the one who said she was convicted of a felony, the marijuana. I don't—
>
> [The State]: I don't think that's—

15

The Court: —believe that was ever—unless there was large quantities.

[Defense Counsel]: Unless she was growing it.

The Court: I mean, I can—I don't know.  I just don't—she said she had a felony.  I'm trying to take her at her word.  When she indicated what the felony was—

[The State]: Right.

The Law Clerk: Judge, she didn't respond this morning when Judge—

The Court: When Judge Youngs asked about the felony, she didn't mention it.  I'm going to keep her there.  I just—unless you guys feel differently.

[The State]: No, I think that's fine.

Bozeman did not object.  Juror 18 was seated on the jury.

Section 494.425 provides, in relevant part, "[a]ny person who has been convicted of a felony, unless such person has been restored to his civil rights" "shall be disqualified from serving as a petit or grand juror."  § 494.425(4).  Bozeman argues that because Juror 18 was seated on the jury in violation of section 494.425(4), the jury was not comprised of twelve qualified jurors.  Bozeman argues this error violated his rights to due process, a fair trial, and an impartial jury.

As Juror 18 had previously been convicted of a felony, she was statutorily disqualified from sitting on the jury pursuant to section 494.425(4) and it was error for her to be seated as a juror.

Bozeman argues that manifest injustice automatically resulted from the error and that we must reverse his convictions and grant a new trial.  The State concedes that it was error for Juror 18 to sit on the jury, but it instead argues that Bozeman must follow the plain error review framework from *State v. Brandolese*, and under this framework Bozeman has not shown he

16

suffered the manifest injustice or miscarriage of justice required for plain error review. We agree with the State.

In *Brandolese*, a defendant argued that the trial court plainly erred in failing to strike a juror for cause because she was the sister of an assistant prosecuting attorney who participated in the defendant's case. 601 S.W.3d at 524. The defendant claimed the trial court's ruling violated section 494.470.1[5] and his right to a fair and impartial jury. *Id.* at 524-25. The Court stated that the claim was only reviewable under plain error review because the defendant's claim on this issue was not preserved. *Id.* at 526-30.

The Missouri Supreme Court held that "[w]hile an individual who meets the criteria for disqualification under section 494.470.1 should be disqualified and excused, failure to do so does not independently result in manifest injustice, especially where there is no evidence the juror knew of her relative's involvement in the case." *Id.* at 530. The Court further stated that "[a] violation of section 494.470.1 *or any juror qualification statute* does not itself manifestly insinuate that a defendant received an unfair and unjust trial warranting plain error review and relief under Rule 30.20." *Id.* at 529 (emphasis added). "Under plain error review, the defendant still bears the burden of establishing manifest injustice if an unqualified juror serves on a jury." *Id.* (citing *Oates*, 540 S.W.3d at 863). *Brandolese* expressly noted section 494.425's inclusion of

---

[5] Section 494.470.1 provides, in pertinent part, "no person who is kin to . . . the injured party, accused, or prosecuting or circuit attorney in a criminal case within the fourth degree of consanguinity or affinity shall be sworn as a juror in the same cause."

*Brandolese* did not decide whether the trial court's failure to sustain the defendant's challenge to strike the juror for cause violated section 494.470.1 because the defendant did not demonstrate that the alleged error led to manifest injustice warranting plain error review. *State v. Brandolese*, 601 S.W.3d 519, 526 (Mo. banc 2020).

felon disqualification. *See id.* at 530 n.9. The Court unequivocally stated that, "[a]bsent evidence to the contrary, manifest injustice does not automatically result if a statutorily disqualified juror serves on a jury." *Id.*

Bozeman claims that this language from *Brandolese* is merely dicta that we are not bound to follow. We disagree. "Statements are obiter dicta if they are not essential to the court's decision of the issue before it." *State v. Woolery*, 687 S.W.3d 652, 664 n.11 (Mo. banc 2024) (quoting *Swisher v. Swisher*, 124 S.W.3d 477, 482 (Mo. App. W.D. 2003)). *Brandolese*'s discussion of whether manifest injustice automatically results if a statutorily disqualified juror sits on a jury was not dicta and it was essential to the Court's decision. This Court is bound by *Brandolese*'s holding that a defendant bears the burden of demonstrating manifest injustice when an unqualified juror sits on a criminal case and that manifest injustice does not automatically result.

Like the defendant in *Brandolese*, Bozeman did not carry his burden of facially establishing substantial grounds for believing manifest injustice or miscarriage of justice occurred. Although Bozeman claims the trial court's failure to disqualify Juror 18 under section 494.425(4) violated his right to a fair and impartial jury resulting in manifest injustice, there is no evidence or allegation beyond the unpreserved error itself that Bozeman suffered an unfair or unjust trial. Therefore, we decline to review for plain error.

Point three is denied.

### Conclusion

The trial court's judgment is affirmed.

Janet Sutton, Judge

W. Douglas Thomson, P.J., and Karen King Mitchell, J. concur.